## THE COLUMBIA.

(District Court, S. D. New York. March 24, 1899.)

### No. 77.

1. COLLISION—STEAM FERRYBOAT AND STEAM PROPELLER.

A steam ferryboat collided with a steam propeller in the East river, near the Grand Street Ferry slip on the New York side. The ferryboat gave a signal of two whistles when one-third across from the New York shore, to which the propeller immediately answered with one; and thereafter the ferryboat navigated in disregard of the propeller's signal, and persisted in the effort to cross her bows, though the ferryboat had the propeller on her starboard hand. The ferryboat was not keeping an attentive lookout, and did not see the propeller until more than halfway across the river, and if she had reversed when she saw the propeller, so as to go astern, as it was her duty, the collision would not have occurred. *Held,* that the ferryboat is liable.[1]

2. SAME—MUTUAL FAULT.

A steam propeller in the East river, required by law to navigate in midriver, was going downstream, not more than 200 feet from the New York shore, near the docks, and with lights dim, if not out, when she collided with a ferryboat which was in fault for not keeping a lookout, nor obeying the propeller's signal, nor reversing and going astern, according to the rules of navigation. *Held,* that the propeller contributed to the collision.

This was a libel by the New York & Norwalk Steamboat Company against the steam ferryboat Columbia for a collision. Decree for libelant for one-half damages.

James J. Macklin, for libelant.

Wilcox, Adams & Green, for respondent.

BROWN, District Judge. At about 5:30 a. m., January 19, 1897, the ferryboat Columbia on her trip from South Seventh street, Brooklyn, to Grand street, New York, came in collision just outside of the New York slip with the steam freight propeller Eagle, bound down the East river, striking the port side of the propeller nearly at right angles about two-thirds the distance towards her stern, inflicting the damage for which the above libel was filed. It was one of the coldest mornings of the winter. The night was very clear; the moon was full the day before, and at the time of the collision was about one or two hours high. Before the collision, the ferryboat had given a signal of two whistles twice to the propeller, and the propeller had twice given a signal of one whistle to the ferryboat.

The ferryboat had the propeller on her starboard hand and was bound to keep out of the way. The propeller was coming down near the New York shore, probably to get the benefit of the slacker tide, which had then been running flood about an hour. The defense of the ferryboat in substance is that the propeller showed no lights of any kind; that she was close by the shore and in its shadows, and could not be seen in time to avoid her. The propeller's witnesses asserted that her lights were all burning. Fifteen witnesses for the ferryboat

[1] As to signification of signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

say that no lights were visible up to the moment of collision. The chief part of the litigation was upon that point, and the testimony of at least one-half of the witnesses for the ferryboat on this subject, I consider of little value. Many of them did not notice the propeller until she was already so far past the bows of the ferryboat that the propeller's head light and colored light would not be visible. Several did not know what high lights were required to be carried, and evidently did not look for the high pole light. Others swear that no light whatever was to be seen, while others show that there was a light in the galley, and a light used in launching the small boat to examine the damage to the propeller immediately after the collision, and while the boats were near each other; so that practically there are but four or five of the ferryboat's witnesses whose testimony I regard as of much weight on the question of lights. These were, however, competent persons, and considering their evidence as well as the evidence on the part of the propeller, I think the probability is that the propeller's lights, though they may not have been wholly extinguished, were burning only quite dimly. In the extreme cold weather they may have required some trimming during the night, which was not attended to; and in a very bright night like this they would naturally show still more dimly.

But even if the propeller's four lights were all out, which is scarcely probable, in such a night as this the propeller would have been readily seen if any proper watch had been kept from the ferryboat. There was no lookout attending to his duties. But notwithstanding this fact, I am satisfied that the propeller was seen by the pilot of the ferryboat in time to avoid her, had he reversed at once, as was his duty in the situation presented. There was nothing on the west shore of the river to cast such long shadows as to prevent a clear vision of the moving propeller. She was at least 200 feet from the docks, and the docks were not covered. The ferryboat did not reverse, according to her own testimony, until within 50 or 100 feet of the propeller, and for this delay the evidence shows no excuse. Though ferryboats are entitled to a reasonable freedom for entrance and egress to their slips, the rules of navigation are not all abolished in their favor. The evidence leaves no doubt that notwithstanding a poor lookout, the propeller was seen when she was off the upper dock at Broome street, and at collision her bow was 75 feet below the ferryboat, off the middle slip at Grand street. It follows that the propeller moved at least 300 feet from the time she was seen at Broome street. As her engines were stopped for part of that time, and she was moving against the tide, not more than 3 or 4 knots by land, plainly the ferryboat in the same time must have traversed twice that distance or more, i. e., at least 600 feet. Three hundred or 400 feet was a sufficient space in which to come to a dead stop by reversing. The collision probably happened about 100 feet outside of the line of the dock at Grand street, although by the motion of the ferryboat the stern of the propeller was carried in considerably, so that several of the witnesses described the collision as being inside of the line of the dock. When the propeller was first seen by the ferryboat,

the ferryboat was, therefore, about 700 feet from the New York shore, that is between one-third and one-half way across the river, which is there about 1,800 feet wide. The witness, Downing, whom I regard as one of the most trustworthy on the part of the respondent, places the ferryboat at that time as one-third across the river, which would be nearly 600 feet from the New York docks.

I find the ferryboat to blame, first, for an inattentive lookout, in consequence of which the propeller was not seen until the ferryboat was more than halfway across the river; secondly, for not heeding the signal of one whistle given by the propeller; thirdly, for not reversing at once when the propeller was seen, so as to go astern of her as was her duty in that situation, instead of claiming and attempting to enforce a superior right of way (a claim which is also set up in the answer) with a signal of two whistles given twice, contrary to the rules of navigation, when it was manifest that that course involved danger of collision. The ferryboat bases that claim upon the contention that she was then near to her New York slip, whereas at her first signal that certainly was not the fact. Nothing at that time prevented her from reversing and going astern of the propeller.

2. The account of the navigation given by the pilot of the propeller is substantially in accord with that given by the pilot of the ferryboat. From South Seventh street there are three ferries, one to Twenty-Third street, New York, one to Grand street, New York, and one to Roosevelt street, New York. The Columbia left her slip under a port wheel in order to give abundant room to the incoming boat to the southward. This carried her up river at first, to counteract which she soon swung down so much that the pilot of the propeller believed she was going to Roosevelt street. When after that she began to haul more toward New York, being about one-half way across the river, the pilot of the propeller was first able to make out that she was going to the Grand Street Ferry. He then properly gave one whistle and ported his helm a little. This whistle was not answered at once, and according to the testimony of the witnesses for the ferryboat, was not observed; but shortly afterwards the ferryboat's first signal of two whistles was improperly given to the propeller when, as I find, she was at least one-third the way across from the New York shore. The propeller immediately answered with one. The pilot of the propeller testified that he ported his wheel only three spokes, but that it was enough to work in somewhat to the New York shore. During the short time that intervened I am persuaded that this change towards the New York shore could not have been more than 100 feet, and I consequently find as above stated that she was going down not more than 200 feet from the New York shore, if so much. The propeller was required by law to navigate in mid-river. Her position so near to the docks and with lights dim, if not out, involves the propeller also so directly in fault contributing to the collision, that she can recover but one-half her damages.

Decree accordingly.